IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| JASON MILLER, on his own behalf and all similarly situated individuals, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 4:14-cv-00007-WTM-GRS |
| GARIBALDI'S, INC., a Georgia for-profit corporation, and THE OLDE PINK HOUSE, INC., a Georgia for-profit corporation, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS

## MOTION FOR  SUMMARY JUDGMENT

### I.

### INTRODUCTION

Although the number of Plaintiffs pursuing this collective action against the Defendant is relatively small, the legal issues presented in this case are numerous, but lend themselves to dispositive treatment by this Court based upon the undisputed facts. The Defendant moves for summary judgment on the following issues: 1) Defendant did not violate the FLSA by including its maître d's in its mandatory tip pool; 2) Defendant complied with the FLSA's provisions regarding notice to tipped employees; 3) Plaintiffs are not entitled to recover their tip outs as a measure of damages should they prevail on their claims; 4) Defendant's conduct was not willful and thus the statute of limitations to be applied is two years, not three years, should the Plaintiffs prevail on their claims; and 5) Plaintiffs are not entitled to an award of liquidated damages, should they prevail on their claims.

1

## II.

## STATEMENT OF CASE AND RELEVANT FACTS

This lawsuit was commenced with the filing of a summons and complaint by Plaintiff Jason Miller on January 10, 2014. Dkt. No. 1. As requested by Plaintiff Miller, this Court ordered conditional certification of Plaintiff's claims under the Fair Labor Standards Act (FLSA) on March 13, 2015 as to the Defendant Garbaldi's, based upon the Plaintiffs' claims that the Defendant improperly included employees that the plaintiff identified as "Managers on Duty" in its mandatory tip pool. Dkt. No. 36. As approved by this Court, the notice thereafter sent to putative class members, styled *Notice of Fair Labor Standards Act Collective Action*, describes this lawsuit as one alleging that the "Defendant Garibaldi's, Inc. violated the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, by maintaining a tip pool which required servers to involuntarily tip out to employees who should not have been included in the tip pool." Dkt. No. 37.  No mention of any other violation of the FLSA is included in the Notice to potential collective action members. *Id.*

Prior to the Court's ruling on their motion for conditional certification, twelve Plaintiffs opted into the lawsuit. Dkt. Nos. 7, 8, 16-22, 25-27. After the Order granting conditional certification, the agreed upon notice was mailed, and another twelve Plaintiffs opted in. Dkt. Nos. 42-47.  Three of Plaintiffs subsequently withdrew their consents. Dkt. Nos. 50, 51 and 53. One Plaintiff, Stephen Adams, was never employed at Garibaldi's, and the parties agree that he is not a proper party to this action. Pending before the Court is the Defendant's motion to dismiss six other Plaintiffs on account of their failure to respond to discovery requests, a motion which Plaintiffs have effectively conceded, but urge that the dismissal of these plaintiffs be without

prejudice. Dkt. Nos. 75-77. Consequently, a total of fifteen plaintiffs will be left in this lawsuit: Jason Miller, David J. Tejeda, Richard Nagro-Crowley, Nathan Ilinitch, Rory Carmody, Terrence Major, Daniel Hernandez, Shaunny L. Ybarra, Carson Branon, Jayme Collins, Bethany Hattaway, Mary Shuman, Christopher Graham, Laura Devlin and Blair Ritzert.

Garibaldi's Café is a fine dining restaurant in Savannah which opened in 1980 and remains at its first location, a converted 1871 firehouse at 315 W. Congress Street.  At all times material to this litigation, the restaurant was open in the evenings from 5 p.m. to 10:30 p.m., Sunday through Thursday, and 5 p.m. to 11 p.m., Fridays and Saturdays. Garibaldi's has won numerous awards for its cuisine and hospitality, and it has always been among the most popular upscale restaurants in Savannah. It consistently receives five star reviews from patrons, and this level of customer satisfaction - with the attendant stream of generous gratuities - has made Garibaldi's a favorite workplace of restaurant servers. Consequently, Garibaldi's has always had a healthy demand of applicants for server employment.  *See* Affidavit of Eric Richards, Exhibit 1, pp. 1-2. Applicants for server positions are hired by the restaurant's General Manager, although they may have initial contact with other employees at the restaurant who refer them to the General Manager.  *Id.*, at p. 3.

Garibaldi's utilizes the "tip credit wage" to pay its servers. *See* Dep. of Eric Richards, Exhibit 2, pp.129-33. Generally, the FLSA mandates that covered employees receive a minimum wage from their employers of at least $7.25 per hour. 29 U.S.C. § 206(a)(1)(c). The FLSA creates an exception, however, for "tipped employees." 29 U.S.C. §203(m). Rather than paying the full minimum wage directly in cash, an employer may pay a tipped employee a reduced cash wage, so long as the employee's tips are sufficient to make up the difference between the cash

wage and the full minimum wage. Under the FLSA, the direct cash payment may be as little as $2.13 per hour. *Id.*  In such a case, the employee receives the tips, and the employer designates $5.12 per hour of the tips for use as a "tip credit" to meet the $7.25 per hour minimum wage requirement. Those designated tips are considered part of the employee's "regular rate."  Tips in excess of those used for the tip credit are not considered part of the regular rate.  29 C.F.R. §531.60.

During their initial training period, it is undisputed that the Plaintiffs were directly paid the full minimum wage that was required by federal law. *See* Affidavit of Chris Zinaich, May 8, 2014, p. 4, Exhibit 3 (Zinaich Aff. I).[1] Each of the Plaintiffs was advised, however, that they would be paid $2.13 per hour plus tips after they completed their training period, and their bi-weekly pay stubs confirmed this pay rate. *See* Affidavit of Della Mellis, Exhibit 4, p. 5, Exhibit E thereto. *See also* Dep. of Plaintiff Chris Graham, Exhibit 10, pp. 87-88.  Moreover, several of the Plaintiffs received written notification of their wage rate, which they acknowledged by signing, and which was placed in their personnel files. *See* Suggested Terms of Employment Notices, BATES-stamped Nos. 497, 546 and 588 to Defendant's Responses to Plaintiff's First Set of Discovery, Exhibit 5 hereto. During the training period, the trainees were trained by experienced servers whose hourly pay was enhanced by Garibaldi's so as to compensate them for providing the training. Every server hired at Garibaldi's received extensive training - several days of it - regardless of the server's prior background in the restaurant industry. *See* Zinaich Aff. I, Exhibit 3, p. 4; Richards Dep., Exhibit 2, p. 136.

---

[1] Several of the Plaintiffs testified to this fact, and importantly, none provided any testimony to the contrary at their depositions. *See, e.g.,* Dep. of Blair Ritzert, Exhibit 17, pp. 18-19; Dep. of Christopher Graham, Exhibit 10, p. 10; Dep. of Shaunny Ybarra, Exhibit 21, p. 22.

In addition to the service oriented portions of the training, newly hired servers were trained in the methodology by which the restaurant utilizes the "tip credit" wage permitted by 29 U.S.C. § 203(m). *See* Zinaich Aff. I, Exhibit 3, p. 4.  Specifically, at the close of every shift, the trainees went through the close-out procedure with their trainers. That procedure included the completion of a "tip out" record which identified each of the employees in the tip pool, and calculated the tip out for each of those employees. *Id.* The information was provided from the restaurant's point of sale (POS) equipment which tracks each server's receipts and gratuities for each encounter with patrons. The amount of gratuities "tipped out" to other employees is shown on the tip out record. *See* Mellis Aff., Exhibit 4, p. 5. Significantly, none of the plaintiffs disputes their orientation and training on the close-out procedures. *See, e.g.,* Ritzert Dep., Exhibit 17, p. 19-21; Deposition of Mary Shuman, Exhibit 20, pp. 12-15.

At all times pertinent, the restaurant has prominently posted the "Employee Rights under the Fair Labor Standards Act" posters published by the Wage & Hour Division of the United States Department of Labor. *See* Affidavit of Chris Zinaich, February 14, 2017, Exhibit 6, p. 3 (Zinaich Aff. II); Richards Aff., Exhibit 1, p. 4.  *See also* Graham Dep., Exhibit 10, pp. 37-40, including Exhibits 2 and 3 thereto. The oldest set of these notices, posted soon after their publication and receipt by the Defendant in 2007, was posted on the bulletin board in the second floor wait station area. *See* Zinaich Aff. II, p. 3, Richards Aff., Exhibit 1, p. 4.  The servers assigned to the second floor dining area frequented the wait station area throughout the shift for a number of reasons. They retrieved drinks from the station, as the coffee pot, ice tea maker and water supply were located here. *Id.*; Graham Dep., Exhibit 10, pp. 15-20. Supplies such as silverware, dishes and napkins were also kept here, and retrieved before and during the shift by the servers. *See* Zinaich Aff. II, Exhibit 6, p. 3. Significantly, the "point of sale machine" was

located on a counter near the bulletin board. In order to place food orders with the downstairs kitchen, the servers used this computer for each table that they served during their shift. *Id.* If a server experienced a slow time, including early in his/her shift, the server would often stay in this area, rather than out in the dining area. As a matter of practice and in order to equalize servers' earnings through tips, Garibaldi's management rotated servers between the first and second floors regularly, so all servers who worked for the Defendant were assigned to the second floor on many occasions. *Id.*

Garibaldi's serving areas consist of two large dining rooms on the first two floors of the building. The restaurant's kitchen is located on the first floor, which also includes a full service bar. The second floor's dining area is much larger, and is often utilized for private events. All of the dining area employees are visible to the restaurant's patrons and participate in provision of direct service to the restaurant's patrons. These employees include servers, server assistants, hostesses, food runners and maître d's[2], positions which are included on the "front of the house" payroll[3]. Typically, the restaurant's servers are assigned to tables within a service area on one or the other of the two floors of the restaurants, rotating often, as explained earlier. In recent years, business needs have required two maître d's on duty for each shift, and each maître d' is assigned to one of the two floors. *See* Richards Aff., Exhibit 1, p. 2.

---

[2] The maître d' position is the same position that the Plaintiffs refer to as "manager on duty" or just "manager." As shown by a job description created in the late 1990's, the position was designated "maître d'" by management, who often referred to it as "maitre d' on duty" or "MOD." *See* Richards Dep., Exhibit 2, pp.13-15; "Position Description for Maitre D'", Exhibit 2 to Defendant's Third Requests for Production of Documents, Exhibit 7. However, a few documents produced during discovery also refer to these employees as "managers." This reference in title is immaterial. Defendant acknowledges that its maître d' employees have had limited managerial authority, but as will be discussed, this limited authority did not bar their inclusion in the restaurant's mandatory tip pool.

[3] Kitchen employees, chef, sous chefs, dishwashers, and other similar positions are included on a separate "back of the house" payroll.

The primary role of the maître d' has been to assist in the service of customers to ensure that they were pleased with their dining experience. *See* Ziniach Aff. I, Exhibit 3, pp. 3-4. Assigned to a section of the restaurant, the maître d' greets the customers, seats them at their tables and provides them with menus. If the server assigned to a table was busy, the maître d' would also take the customer's initial drink order. *Id.*, at pp. 2-3. *See also* Graham Dep., Exhibit 10, pp. 34-35. Thereafter, the maître d' would check the tables to make certain that the guests' needs were being met and that their server was properly attentive to them. The maître d' would help the servers in any manner necessary if a problem arose, either by calling the service problem to their attention or by personally remedying it. *See* Zinaich Aff. I, Exhibit 3, pp. 2-3. The maître d' would also try to determine the flow of customers during the shift and ensure that the servers were properly distributed among the tables. If a guest requested a certain server, the maître d' would attempt to accommodate that request. *Id. See also* Mellis Aff., Exhibit 4, p. 3; Affidavit of Sean Dempsey, Exhibit 8, p. 3.

During the period beginning three years prior to the commencement of this lawsuit, and continuing through the date of the most recent employee's termination, there have been a total[4] of eight people employed as maître d's at Garibaldi: Allen Larkin, employed October 18, 2010, to September 12, 2012; Phillip Lupica, employed April 16, 2010, to June 15, 2012; Michael Nix, employed September 3, 2012, to February 8, 2013; Sean Dempsey, employed October 29, 2012, to August 3, 2015; Michael Hewitt, employed April 12, 2013, to January 29, 2015; Sean Paul Wilcox, employed August 11, 2014, to May 22, 2016; Catherine Vinkovich/Murray, employed June 8, 2015, to October 12, 2016; Matthew Korrow, employed June 21, 2015, to April 10, 2016.

---

[4] In addition to these eight, there were two other people who worked in a maître d' capacity, but each worked only a few weeks, and neither was identified by any Plaintiff in a deposition in any material way.

At all times pertinent, the operations of Garibaldi's Café were overseen by Eric Richards, a regional manager who also oversaw The Olde Pink House, a sister restaurant in close proximity to Garibaldi's, and a series of General Managers at Garibaldi's who reported to Richards. *See* Richards Aff., Exhibit 1, p. 2. Every employee at Garibaldi reported to the GM as well as to Eric Richards. The "back of the house" or kitchen personnel reported to the chef who, in turn, reported to the GM and Mr. Richards. The "front of the house" personnel reported directly to the GM and Mr. Richards. When necessity demanded it, if the GM was absent and Mr. Richards was unavailable, the front of the house personnel would report to the chef. *Id*.; Zinaich Aff. I, Exhibit 3, pp. 3-4.

During the relevant period, the accounting, financial recordkeeping, and payroll functions of Garibaldi's were managed by office staff located on the third floor. These personnel report to Mr. Richards, Garibaldi's General Manager, and corporate accounting and administrative staff located in Charleston, South Carolina. The Charleston personnel were and are managed and directed by Della Mellis, Comptroller of Garibaldi Management Corporation, who has been employed by the corporation since 1991. *See* Mellis Aff., Exhibit 4, p. 1.

The maintenance of a mandatory tip sharing arrangement is a common practice in American restaurants. Tip sharing is intended to provide for an equitable sharing of gratuities among the employees involved in the provision of service to the patrons. The treatment of tips and tipped employees under the FLSA is a significant substantive portion of the Act. Relevant Department of Labor regulations, opinion letters, guidance documents, and numerous court decisions have addressed and expounded upon § 3(m) of the FLSA. A brief synopsis of this law is set out by Susan N. Eisenberg  & Jennifer T. Williams, *Symposium:  Fair Labor Standards*

8

*Act:  Evolution of Wage Issues in the Restaurant Industry*, 30 ABA Journal Lab. & Emp. Law 389 (Spring 2015)[5].

At all times pertinent, the tip sharing at Garibaldi has required the restaurant servers to tip out to the bartenders, food runners, server assistants, and the "MOD" (the maître d' employees). *See* Richards Dep., Exhibit 2, pp. 129-31.  The restaurant uses an electronic point of sale system. At closeout, the system prints out an itemized list of sales, payments, and credit card tips by server. The system print out also itemizes the fee charged by credit card companies for credit card transactions. Payments are itemized as cash or credit card.  Back up documentation in the form of the records for each credit card is also provided. Using this information, the server utilizes a form created by the restaurant which: 1) provides an accounting of the cash transactions between the server and the restaurant;  2) provides the amount of each tip out to the eligible classes of employees, and the remaining total of tips declared by the server. All of this is subsequently loaded into an electronic system by which the restaurant complies with its reporting and accounting requirements. *See* Mellis Aff., Exhibit 4, p. 5.

This process is best illustrated by reviewing the documentation of an actual server closeout. Attached as Exhibit 9 is the documentation for a server, Megan Olson, for March 4, 2016. *See* Mellis Aff., Exhibit 4, Exhibit D thereto.

---

[5] Given its publication date, the article does not include any discussion of later cases addressing Section 3(m). *See, e.g., Trejo v. Ryman Hospitality Props.*, 795 F.3d 442 (4th Cir. 2015), *Oregon Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080 (9th Cir.  2016), *Aguila v. Corporate Caterers II, Inc.*, 199 F. Supp. 3d 1358 (S.D. Fla. 2016), and *Malivuk v. Ameripark, LLC*, No. 1:15-cv-2570-WSD, 2016 U.S. Dist. LEXIS 97093 (N.D. Ga. July 26, 2016).



* * * Checkout * * *

Unit # 21                     03/04/2016

MEGAN OLSON (MEGAN)           09:45 PM
SHIFT: 1
REV: Restaurant
JOBCODE: Server

          *** SALES ***
FOOD:                        321.95(+)
Liquor:                       21.00(+)
Beer:                         24.00(+)
GLASS WINE:                   93.00(+)
Beverages:                     1.50(+)

SALES:                       461.45

TOTAL:                       461.45(=)

          *** TAXES ***
EXCLUSIVE:

Sales Tax:                    32.31(+)
Liq Tax:                       0.63(+)

TOTAL:                        32.94

GROSS SALES:                 494.39(=)

          *** PAYMENTS ***
01 Cash:                     107.54
01 Am Ex:                    103.38(-)
02 Visa:                     366.97(-)
TOTAL PAYMENTS               577.89

          *** CC TIPS ***
01 Am Ex:                     13.50
02 Visa:                      70.00
TOTAL TIPS:                   83.50

TIP REFUND:                    2.51(+)

ROUNDING BENEFIT:              0.00(+)

TOTAL CASH OWED:              26.55(=)

=================================

Date: 3/4/16
Name: Megan Olson
Total Cash Owed (+/-) 26.55
Tip Pool MOD  (+) 6.00
Bar   (+) 5.00
SA    (+) 5.00
SA    (+) 5.00
*Total Tip Pool Amt (=) 21.00
Total Cash – Tip Pool (+)(+/-) 47.55
Other (Owed/Owed) _____
Cash Paid (-) 48.00 Init MO
Accrual (=) (0.45)

# Guests 9   # Entrees 9
# Wine Bottles Sold 1

Charge Tips (+) 83.50
Tip Refund 3% (-) 2.51
14.8%
Cash Tip (+) 16.00
18.2%?
*Tip Pool Total (-) 21.00
Ded. Tips (=) 75.99

Manager _____
Employee Megan Olson
Server Trained: _____

EXHIBIT 9

As shown by the printed "Checkout" document, Ms. Olson had total gross sales of $494.39.  $107.54 of the sales were in cash, and the remainder were paid by credit cards.  Her credit card tips totaled $83.50.  The credit card fees for the credit card transaction are calculated as $2.51.

For purposes of cash reconciliation, the practice of the restaurant is to allow the credit card tips ($83.50) to be treated as the equivalent of cash payable to the server where cash sales allow this practice. From this amount, the credit card fee ($2.51) is subtracted.  Thus, for purposes of cash reconciliation, Ms. Olson has a credit of $80.99 ($83.50 - $2.51).  At the time of closeout, Ms. Olson had the cash she had collected on cash receipts for recorded cash sales on behalf of the house, $107.54.  $107.54 less the $80.99 = $26.55, the cash she owes the restaurant on the $107.54 in receipts.  This $26.55 may be paid from the $107.54 she received in cash sales. She is also required to tip out a total of $21.00.[6] This tip out is paid from the tips she received. Thus, for cash reconciliation purposes, Ms. Olson owes $26.55 from the cash receipts and $21.00 from her credit card tips. This totals $47.55. She pays an extra $.45 - presumably to avoid making change, but accrues the $.45 for payment on her paycheck. From the $107.54, this leaves $59.99 cash in her possession.  In addition, she has also retained whatever tips accompanied her cash sales.

The lower half of the restaurant form provides the area in which calculates Ms. Olson's declared tips - the tips which she acknowledges netting, and which are reported as income.  In this case, Ms. Olson's declared tips total $75.99.  This total includes cash tips which Ms. Olson received directly from guests. Only Ms. Olson had any knowledge of these tips.  The calculations in this section begin with the $83.50 in credit card tips she received. From that amount is subtracted the credit card processing fee ($2.51).  The declared cash tips ($16.00) are added.  The tip pool total ($21.00) is subtracted. The balance, $75.99, is the tip amount which the server declares.  In this particular case, if she chooses, Ms. Olson may take home $75.99 at the close of the shift.

---

[6] The calculation of the tip out amounts will be explained below.

As noted above, a server tips out to four categories of employees: the MOD, the bartender, the server assistant, and the food runner.[7]  The tip out to the food runner is always $5.00.  Each of the tip outs to the server assistant and the bartender is equal 1% of the server's gross sales for that shift, rounded to the closest whole dollar.  Thus, in the case of Ms. Olson, 1% of her $494.39 gross sales equals $4.94 which rounds up to $5.00.  The tip out for the MOD equals 1.2% of the gross sales rounded to the nearest whole dollar.  Thus, in the case of Ms. Olson, 1.2% of her $494.39 gross sales equals $5.93 which rounds up to $6.00.

As indicated earlier, every server goes through and becomes familiar with the close out procedure during their training period. Thereafter, every server goes through the close out procedure on every shift and signs off on an accounting of the closeout at the end of the shift. *See* Graham Dep., Exhibit 10, pp. 19-28. Christopher Graham verified all the forgoing calculations that are set out above as he examined Ms. Olson's closeout sheet at his deposition. *Id*., at pp. 19-27.

The payroll function at Garibaldi designates the required amount of tips needed to fund the "tip credit", and ensures that no server is paid less than the wage required by the FLSA. *See* Mellis Aff., Exhibit 4, p. 5.

---

[7] The printed form shows "SA" (server assistant) twice, but the second SA is the food runner.

# III.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Great Am. Alliance Ins. Co. v. Anderson*, 847 F.3d 1327, 1331 (11th Cir. 2017). An issue is not "genuine" if it is unsupported by the evidence or is created by evidence that is "merely colorable" or "not significantly probative." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Similarly, an issue is only material if it "may affect the outcome of the suit under governing law." *Great Am. Alliance Ins. Co.*, 847 F.3d at 1331 (quoting *Anderson*, 477 U.S. at 248). The moving party always bears the initial burden of identifying to the court those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986) (internal citation omitted). The moving party's initial burden at this stage is to essentially negate an essential element of the non-moving party's case or to show that there is no evidence to prove a fact necessary to the non-moving party's case. *See Young v. City of Augusta*, 59 F.3d 1160, 1170 (11th Cir. 1995).

After the moving party has satisfied this burden, the obligation of the non-moving party arises to present "significant, probative evidence demonstrating the existence of a triable issue of fact." *Chanel, Inc. v. Italian Activewear of Fla., Inc*., 931 F.2d 1472, 1477 (11th Cir. 1991). The non-moving party may not oppose a properly supported summary judgment motion by merely

resting upon the denials or allegations of his pleading, but must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation omitted).

At the summary judgment stage, all evidence and justifiable factual inferences must be viewed in the light most favorable to the non-moving party. *Rollins v. TechSouth, Inc*., 833 F.2d 1525, 1532 (11th Cir. 1987). "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *United States v. Four Parcels of Real Prop*., 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Anderson*, 477 U.S. at 255). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson*, 477 U.S. at 247-48.

## IV.

## <u>ARGUMENT</u>

### A.  <u>Defendant is Entitled as a Matter of Law to a Ruling That It Did Not Violate the FLSA by Including its Maître D's in its Mandatory Tip Pool</u>

The Plaintiffs contend that Garibaldi's tip sharing arrangement violates the FLSA because the servers are required[8] to share tips with the maître d' employees.  The section of the FLSA

---

[8] Although § 203(m) is silent on the issue, its requirement that tip pool participants "customarily and regularly receive tips" does not apply to voluntary tip sharing arrangements. *Markov v. Golden Isles Cruise Lines, Inc.*, CV 215-018, 2016 U.S. Dist. LEXIS 36016, at *25 (S.D. Ga. Mar. 21, 2016) ("[A] tipped employee may voluntarily choose to share tips with an otherwise ineligible employee so long as that tip-sharing is done without coercion by the employer."). *See also Roussell v. Brinker Int'l, Inc.*, Civil Action No. H-05-3733, 2008 U.S. Dist. LEXIS 52568, at *69-76 (S.D. Tex. July 9, 2008) (holding that employees may share tips with other workers who are not customarily and regularly tipped if they do so "free from any coercion whatever and

which allows an employer to use the tip credit wage to pay an employee requires that "all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips."  29 U.S.C. § 203(m). The requirement that an employee must retain all his tips does not prohibit the pooling of tips among employees who customarily and regularly receive tips.  The requirement does prohibit, however, an "employer" under the FLSA from sharing in the tip pool. *See Kubiak v. S.W. Cowboy, Inc.*, 164 F. Supp. 3d 1344, 1358-59 (M.D. Fla. 2016). As will be shown by the record of this case, the maître d' employees of Garibaldi are lawfully included in the restaurant tip pool because they meet the requirements of § 203(m).

Employees who share in tips through a tip-pooling or tip-splitting arrangement are tipped employees if they customarily and regularly receive more than $30 a month in tips. 29 C.F.R. § 531.54.  Due to their inclusion in the tip pool, Garibaldi's maître d' employees received more than $30 per month.  Tip pool eligible employees need not be tipped directly if they are engaged in an occupation where undesignated tips are common, and they perform important service functions.  *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 301-02 (6th Cir. 1998). *See also Dole v. Continental Cuisine, Inc.*, 751 F. Supp. 799, 800-801 (E.D. Ark. 1990) (upholding tip pool which included maître d' whose duties included setting up the dining room, greeting and seating customers, serving first drink to customers and assisting servers in serving customers as needed), *Rudy v. Consol. Rest. Cos.*, No. 3:08-CV-0904-L, 2010 U.S. Dist. LEXIS 92764, *8-12 (N.D. Tex. Aug. 18, 2010) (following *Kilgore* and *Dole* and upholding tip pool

---

outside any formalized arrangement or as a condition of employment"); WH Admin. Op. (Oct. 26, 1989); WH Admin. Op. (Mar. 26, 1976).

which included maître d'), and *Morgan v. Speakeasy, LLC*, 625 F. Supp. 2d 632, 653 (N.D. Ill. 2007) (finding restaurant's senior servers were tipped employees because they had "sufficient customer interaction" where senior servers helped serve food and drinks to tables, greeted customers, and checked on tables during dinner service).

It is uncontroverted that the maître d' employees at Garibaldi performed important service functions, and had sufficient customer interaction so as to make them eligible for inclusion in the Garibaldi tip pool. *See* Zinaich Aff. I, Exhibit 3, pp. 2-3; Dempsey Aff., Exhibit 8, p. 3.  There is no competent evidence to the contrary. Rather, the Plaintiffs have provided corroboration of significant customer interaction with the maître d' employees. For example, when asked what the maître d' employees did on the floor, Plaintiff Terrence Major testified that they "... check on the tables, ask them how their dinner and service was.  Anything that went wrong, they were the ones that handled it."  *See* Dep. of Terrence Major, Exhibit 11, pp. 10-13; Graham Dep., Exhibit 10, pp. 34-35.

Of necessity then, the Plaintiffs' challenge of the inclusion of the maître d' in the tip pool is based upon their contention that each maître d' was an "employer" under the FLSA and thus ineligible to share the Plaintiffs' tips. This contention is completely without merit. As a preliminary matter, it is significant to keep in mind that the determination of employer status is a question of law to be decided by the court. *See Patel v. Wargo*, 803 F.2d 632, 634 & n.1 (11th Cir. 1986); *Stuart v. Resurgens Risk Mgmt.*, 2013 U.S. Dist. LEXIS 82962, at *34-35 (N.D. Ga June 12, 2013); *Solano v. A Navas Party Prod.*, 728 F. Supp. 2d 1334, 1340 (S.D. Fla. 2010); *Morales-Arcadio v. Shannon Produce Farms, Inc.*, 2007 U.S. Dist. LEXIS 51950, at *68 (S.D. Ga. July 18, 2007).

The FLSA defines "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). However, because the phrase "any person acting directly or indirectly in the interest of an employer in relation to an employee" would support individual liability against virtually any agent or employee with any supervisory power over employees, courts look to the "economic reality" of the relationship between the parties to determine whether the individual can be considered an "employer" under the FLSA. *See Johnson v. A.P. Prods*., 934 F. Supp. 625, 628-29 (S.D.N.Y. 1996) (internal quotation omitted). *See also Dole*, 751 F. Supp. at 802 (rejecting the idea that "any person who has any supervisory duties over other employees, no matter how minimal, becomes as 'employer' within the meaning" of the FLSA), *Donovan v. Agnew*, 712 F.2d 1509, 1513 (1st Cir. 1983) (stating that the FLSA's broad definition should not be taken literally because "it would make any supervisory employee, even though without any control over the corporation's payroll, personally liable for the unpaid or deficient wages of other employees").

When, however, an individual possesses control over the practice alleged to be unlawful, the FLSA holds that individual accountable as an "employer." *See Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971-72 (5th Cir. 1984). Thus, if an individual is found to be an FLSA *employer* who has unlawfully participated in a tip pool, the individual may be held *personally liable* under the FLSA for the damages associated with the invalidity of the tip pool and the resulting loss of the use of the tip credit wage. *Chu Chung v. New Silver Palace Rest.*, 246 F. Supp. 2d 220, 230-31 (S.D.N.Y. 2002), *cited with approval, Rudy,* 2010 U.S. Dist. LEXIS 92764, at *8.

The Eleventh Circuit has provided several factors to consider under the "economic realities" test in determining whether a person is an "employer" under the FLSA: whether the

alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *Villarreal v. Woodman*, 113 F. 3d 202, 205 (11th Cir. 1997). No one factor in this test is dispositive, and courts look to the totality of the circumstances of the employment relationship, as opposed to formalistic or technical labels. *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 785 (N.D. Ill. 2011) (question is whether individual had control over alleged violation and had duty as statutory employer not to violate the Act).

In addition to the four-factor test provided in *Villarreal v. Woodman*, numerous courts in the Eleventh Circuit, and elsewhere, have developed several additional guideposts in the determination of employer status under the *FLSA. Russell v. Promove, LLC*, No. 1:06-CV-00659-RWS, 2007 U.S. Dist. LEXIS 57407, at *11 (N.D. Ga. Aug. 7, 2007). Significantly, one of the considerations that courts take into account in addition to the "economic realities" test is an analysis of whether the individual alleged to be an employer "has control over the policies or conduct that allegedly violates the FLSA." *Id.* at *12 (citing *Freemon v. Foley*, 911 F. Supp. 326, 331 (N.D. Ill. 1995) ("[E]ven if a defendant does not exercise exclusive control over all the day-to-day affairs of the employer, so long as he or she possesses control over the aspect of employment alleged to have been violated, the FLSA will apply to that individual.").

Where courts have found that the individual did not have the ability or authority to control the allegedly unlawful practice, the vast majority has been hesitant to find employer status. As one court has reasoned, it "is really a question of duty: Based upon their control over

decisions causing the violations of the [FLSA], which persons had a duty as a statutory employer not to violate the Act?" *Dole v. Simpson*, 784 F. Supp. 538, 545 (S.D. Ind. 1991).

For example, in *Rudy v. Consol. Rest. Cos*., No. 3:08-CV-0904-L, 2010 U.S. Dist. LEXIS 92764 (N.D. Tex. Aug. 18, 2010), the plaintiff brought suit against a restaurant where he had worked as a server, contending that the restaurant's tip pool was illegal as a result of maître d's participation in the pool. *Rudy*, 2010 U.S. Dist. LEXIS 92764, at * 6. The maître d's qualified as "employers," because they had the ability to hire, fire, and schedule the servers, the plaintiff alleged, and therefore were ineligible to participate in the employees' tip pool. *Id*. In considering whether these maître d's should rightfully be considered employers, the court took into account whether the maître d's designed the tip pool, decided which employees would participate in it, or determined the percentages of the tip outs. *Id*. at *26. The district court reasoned that ultimately the most important consideration was that the maître d's in fact had no control over the creation or implementation of the tip pool, the very employment practice at issue. Therefore, they could not be considered "employers" under the FLSA and the court granted the defendant's motion for summary judgment on the issue. *Id*. at *26-27.

Similarly, in *Hernandez v. City Wide Insulation of Madison, Inc*., where a claim was brought for failure to pay overtime wages, the court's determination of whether one of the individual defendants could be held liable as an "employer" was guided by whether the he had control over the alleged FLSA violations. *Hernandez v. City Wide Insulation of Madison, Inc.*, No. 05-C-303, 2006 U.S. Dist. LEXIS 48399, at *5-7 (E.D. Wis. July 14, 2006). The court concluded that the defendant could not be considered an employer, and therefore could not be held individually liable under the FLSA. *Id*. at *10. The court reasoned that because the

defendant's payroll related duties were "purely clerical," he played no part in actually determining plaintiffs' overtime wages. *Id*. The most important consideration for the court, in the end, was that "[the defendant] was not responsible for the violation alleged in the present case." *Id.*

The consideration of whether the individual "employer" had control over the practice at issue is so vital to the determination of employer status under the FLSA that several courts have stated that it is to be the "ultimate consideration" in the court's analysis. *See Rudy,* 2010 U.S. Dist. LEXIS 92764, at *15-16. *See also Russell*, 2007 U.S. Dist. LEXIS 57407, at *12 ("[E]mployer status is most strongly demonstrated where the individual has control over the . . .conduct that . . . violates the FLSA."); *Rubin v. Tourneau, Inc.*, 797 F. Supp. 247, 253 (S.D.N.Y. 1992) (stating that the determination of employer status hinges on whether the individuals "exert control over the employer's compliance" with the FLSA); *Davis v. B & S, Inc*., 38 F. Supp. 2d 707, 715 (N.D. Ind. 1998) (reasoning that "the ultimate question facing the Court in the 'economic reality' inquiry is whether the individual had control over the alleged FLSA violation.").

The Eleventh Circuit has itself put this consideration to the forefront of its analysis of employer status under the FLSA. In *Lamonica v. Safe Hurricane Shutters, Inc*., the Court was presented with the issue of whether a director qualified as an "employer" and therefore could be held personally liable under the FLSA for failure to pay overtime wages. *Lamonica v. Safe Hurricane Shutters, Inc*., 711 F.3d 1299, 1314 (11th Cir. 2013). The Court found that the director could rightfully be named an employer for the purposes of the claim for unpaid overtime wages, as he had exercised direct control over whether employees got paid by using his own funds for

20

that very purpose. *Id*. In explaining its reasoning, the Court stated that "[O]ur primary concern is the supervisor's role in causing the FLSA violation," and while the supervisor's control "need not be continuous, it must be both substantial and related to the company's FLSA obligations." *Id*.

The Defendant's memorandum will apply all relevant *Villarreal* factors in its analysis of the issue of whether Garibaldi's maître d' employees are FLSA "employers", but the issue of whether the putative employer had actual operational control over the alleged FLSA violation is especially important in this context. The question before the Court is whether the "employer" is participating in the tip pool. The uncontroverted evidence[9] is that the maître d' employees have absolutely no authority to establish or modify any aspect of the tip pool, nor did they do so. Like the maître d's in *Rudy*, they did not "set wages, did not design the tip pool, and did not decide how the tip pool operated or what percentage of the tip pool was to be distributed to which individual." *Rudy*, 2010 U.S. Dist. LEXIS 92764 at *24.

The closest the maître d's at Garibaldi's came to managing the tip pool was to assist the servers in "checking out" at the end of their shifts and collecting the tip out sheets in the process. The court in *Rudy*, however, explicitly rejected the idea that this minimal level of involvement with the tip pool during the "check out" process was a sufficient level of control over the practice to warrant a finding of employer status. *Id.* at *25-27 (reasoning that duties relating to collecting paperwork at the closing of servers' shifts were "purely clerical" in nature and not related to

---

[9] Affidavits from former general managers and from other representatives of the Defendant establish this fact. *See* Zinaich Aff. II, Exhibit 6, p. 3; Richards Aff., Exhibit 1, p. 3-4; Mellis Aff., Exhibit 4, p. 4. The deposition testimony of Plaintiffs also corroborates it. For example, Plaintiff Bethany Hattaway claimed that she complained to several of the maître d's about tipping out to them, and they replied, "Sorry. It's the rules. Nothing we can do about it." Dep. of Bethany Hattaway, Exhibit 12, p. 27.

design or control of tip pool).[10] As in *Ruby*, the maître d' employees at Garibaldi had no authority regarding the tip pool.  Consequently, as regards the tip pool, they are not employers within the meaning of the FLSA.  In other words, the "economic reality" is that the maître d' employees are not FLSA employers with regard to this operational aspect of the restaurant. Their inclusion in the tip pool, therefore, does not violate the FLSA, and summary judgment is appropriate.

An examination of the record of this case for application of the other *Villarreal* factors leads to the same conclusion that inclusion of the maitre d's does not violate the FLSA. The maître d' employees were not given the authority to hire and fire the employees. The affidavits from former maître d's, former general managers, and other representatives of the Defendant unanimously establish this fact. *See* Affidavits of Zinaich I, Exhibit 3, p. 2; Allen Larkin, Exhibit 13, p. 2; Sean Dempsey, Exhibit 8, p.2; Eric Richards, Exhibit 1, p.3; Della Mellis, Exhibit 4, pp. 3-4. *See also* Richards Dep., Exhibit 2, pp. 71; Dep. of Della Mellis, Exhibit 14, pp. 17-22. There is no *competent* evidence to the contrary. Rather, several of the deposed Plaintiffs offered their own speculative testimony about the identity of Garbaldi employees whom they believe may have been responsible for certain hirings and firings, based upon their limited observations. For

---

[10] The maître d's at Garibaldi's also bear a striking resemblance to the "senior servers" in *Morgan v. Speak Easy, LLC*. 625 F. Supp. 2d 632, 653 (N.D. Ill. 2007). These senior servers were "more experienced" servers that performed largely the same duties as Garibaldi's maître d's, including: helping with closing, handling customer complaints, handling money, sending employees home, taking inventory, and maintaining the restaurant's cleanliness. *Id.* In *Morgan*, the district court concluded that these senior servers could not rightfully be considered employers for the purpose of their participation in the tip pool, because the senior servers took no part in determining the rate and method of employee payment. *Id.* Additionally, the mere fact that maître d's derived profit from participating in the employee tip pool at Garibaldi's is not sufficient to support a finding of employer status standing on its own. *See generally id.* The FLSA's goal of imposing liability only on those individuals that have the duty and the ability to ensure FLSA compliance would be ill served if every employee who benefitted in the slightest from the policy at issue were found to be an "employer" by the court. *See Dole*, 751 F. Supp. at 802; *Dole v. Simpson*, 784 F. Supp. at 545.

purposes of this Motion for Summary Judgment, however, the Court must keep in mind the Eleventh Circuit's admonition regarding the standard of evidence that may be considered under Rule 56(e):

> Rule 56(e) of the Federal Rules of Civil Procedure requires that "affidavits" that support or oppose summary judgment motions "shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence." *This rule also applies to testimony given on deposition*.

*Macuba v. DeBoer*, 193 F.3d 1316, 1322-1323 (11th Cir. 1999) (inadmissible hearsay cannot be considered on motion for summary judgment) (emphasis added; citation omitted); *Morales-Arcado v. Shannon Produce Farms*, 2007 U.S. Dist. LEXIS 51950 (S.D. Ga. July 18, 2007).

As the undisputed evidence adduced from both Plaintiffs and Defendant's employees reveals, the maître d' employees were authorized to send front of the house employees home and suspend their employment when the need arose. Usually, this involved the failure of the front of the house employee to comply with standards of dress and behavior that were well known to all the front of the house employees. For example, servers who reported to work inebriated, or wearing dirty clothes, were sent home. *See* Dep. of Daniel Hernandez, Exhibit 15, pp.29-32.

From the authority of the maitre d's to send employees home, some of the Plaintiff deponents have inferred that the maître d' employees had the authority to terminate and exercised it. However, every such "termination" which was identified by the Plaintiff deponent was actually one effected by the General Manager. Plaintiff deponents are unable to offer any *competent* evidence to contradict these facts. In fact, several plaintiffs actually confirmed that only the General Manager could terminate employees at Garibaldi's. For example, Plaintiff

Daniel Hernandez, who worked for the Defendant for almost six years, unambiguously and honestly testified as follows:

> Q.  And I believe that you testified in your deposition earlier that you do not recall any occasion in which one of these assistant managers that you recall terminated anybody, correct?
>
> A.  Terminated, no.
>
> Q.  And you kind of qualify that. What do you mean by terminated, no?
>
> A.  I mean, they would---they would send people home and stuff and be like go home for the shift.  Or I need to pull you off the floor. But ultimately fire someone as you're done, that decision ultimately was Chris's whenever it came up, if they had a problem with somebody or something.
>
> Q.  And how do you know that? How do you know that?
>
> A.  Because whoever was fired would always talk to Chris.
>
> Q.  Okay.  Would Mr. Lupica or Mr. Larkin ever say I'm going to send you home and it'll be up to Chris as to whether you were terminated or not?
>
> A.  Yes.

*See* Hernandez Dep., Exhibit 15, pp. 25-27. *See also* Hattaway Dep., Exhibit 12, pp. 17-23 (only the general managers hired and fired; maitre d's were not supposed to hire or fire).  A number of the Plaintiffs, when asked directly about any maitre d's terminating any employee, acknowledged that they had no personal knowledge that this had occurred.  *See* Dep. of Carson Branon, Exhibit 16, pp. 20-25; Ritzert Dep., Exhibit 17, pp. 34-41; Dep. of Daniel Tajeda, Exhibit 18, pp. 22-33; and Dep. of Laura Devlin, Exhibit 19, pp. 20-22.

In his deposition, Plaintiff Terrence Major testified that he had no personal knowledge of either Mr. Larkin or Mr. Lupica terminating any employee, although he "assumed" that they did because he thought that they did everything else that managers do. *See* Major Dep., Exhibit 11, pp. 14-17. Assumptions such as that made by Mr. Major underlie and weave their way

throughout the Plaintiffs' testimony; however, they decidedly do not create an issue of material fact. For the most part, these assumptions or beliefs were grounded upon their observations that an employee was sent home by a maitre d', and their corresponding recollection that they never saw that employee again. This misguided, inaccurate assumption is best and most colorfully described by Plaintiff Mary Shuman when asked why she believed maitre d' Michael Hewitt had terminated several unidentified food runners:

> A.     …They had come in late and he went over to the corner. But there's acoustics in there from the wood floors and we could all hear it. We heard doo, doo, doo, down the stairs. Never to be seen again.

Shuman Dep., Exhibit 20, pp. 17-28.

Like Ms. Shuman, several Plaintiffs testified hopefully that they "knew" maître d's had terminated employees, but could not identify any such employees by name. For example, Shaunny Ybarra testified that she "knew" Mr. Lupica terminated employees solely "because they left." Ybarra Dep., Exhibit 21, pp. 6-13. She could not remember any names, but when pressed by counsel for Defendant to support her claim, testified only that Mr. Lupica had sent her home, but *didn't fire her. Id.* Former Plaintiff Lauren Polk testified that she thought Michael Hewitt terminated an employee during a party or wedding, but she could not remember "who or when or any details." *See* Dep. of Lauren Polk, Exhibit 22, pp. 15-18. She did not recall the other maitre d' with whom she worked terminating anyone. *Id.* Again, no material issue of fact has been presented by this vague, unsubstantiated and contradictory testimony, particularly when presented with the sworn testimony of Defendant's witnesses and the documentation that is available.

Four Plaintiffs testified that maître d' Philip Lupica fired Plaintiff Nathan Ilinitch---Rory Carmody, Jason Miller, Todd Jones and Mr. Ilinitich himself.   *See* Dep. of Rory Carmody, Exhibit 23, pp. 30-34;  Dep. of Jason Miller, Exhibit 24, pp. 39-40, 52; Dep. of Todd Jones, Exhibit  25, p. 28-30 and Dep. of Nathan Ilinitch, Exhibit 26, p.27.  Sent home by Mr. Lupica on the last day he worked, the circumstances surrounding Plaintiff Ilinitch's separation from Garibaldi's are confusing, but clearly demonstrate that General Manager Chris Zinaich was in control of Mr. Ilinitch's fate, not Mr. Lupica.   According to Defendant's records, Plaintiff Ilinitch had turned in his two week resignation notice in February of 2012, a fact that he does not dispute.  *See* Ilinitch Dep., Exhibit 26, p. 27.  During the last two weeks of his employment, however, he continued his difficult relationship with Mr. Lupica. On March 7, he admittedly disregarded prior instructions about not drinking soda from the bar, and was caught by Mr. Lupica.  *Id*. at pp. 53-54. He challenged Mr. Lupica to write him up, as he was quitting anyhow, and claims that Mr. Lupica told him to go home as he was fired. *Id*. at 58-61. Significantly, the Counseling Agreement for this incident clearly states that he was sent home *subject to Mr. Zinaich's allowing him to return*.[11]  Id., Exhibit 8 to deposition. Plaintiff Ilinitch  admitted as much in his deposition:

> Q.     On the blank that's in the third question, it indicates that you were not allowed to work until meeting with Chris Z.  Did he tell you Chris was going to deal with you later?
>
> A.    Well, he didn't tell me that, but that was an understood thing.  Chris had the power to change things if Chris decided, you know, he would want me back.
>
> Q.    All right. So the maitre' d's or the manager on duty was the one that would send you home, and Chris would have the final say as to whether you were terminated or not; correct?

---

[11] The counseling agreement issued states that Mr. Ilinitch is "not allowed to work until meeting with Chris Z" and "Suspension and Termination Pending."  *Id*. at Exhibit 8.

26

A. Not this time. Phillip Lupica did it and Chris decided not to go against Phillip on this one.

Q. Okay. So you don't know what kind of conversation Phillip Lupica and Chris Zinaich had about you?

A. No. That was my last time in that building.

*Id.* at 60-61. This Plaintiff thus clearly understood that, although Mr. Lupica could tell him to go home and even say that he was fired, it was ultimately General Manager Zinaich's decision whether to allow him to return to work for the remainder of his notice period. Mr. Zinaich chose to end Mr. Ilinitch's employment two days later, on March 9, 2012, filling out the Termination Form by stating that he had "Resigned for other employment", rather than terminating him for his conduct. *See* Zinaich Aff. II, Exhibit 6, p. 1-2, Exhibit A thereto. Thus, contrary to the impressions left to these four Plaintiffs, the indisputable facts are that Mr. Lupica was not the person who terminated Mr. Ilinitch, did not have the authority to terminate Mr. Ilinitch and was well aware of this fact as he acknowledged in the Counseling Agreement. *See* Exhibit 8 to Ilinitch Dep., Exhibit, 26.

Plaintiff Rory Carmody[12] also testified that Mr. Lupica fired server Doug Treadwell in front of the staff who were serving at a party at Garibaldi's. *See* Carmody Dep., Exhibit 23, pp. 30-38. Mr. Treadwell was fired for having intimate contact with a customer in the ladies' restroom during this party. *See* Zinaich Aff. II, Exhibit 6, p. 2. Among others, Mr. Carmody observed Mr. Lupica talking with Mr. Treadwell after he exited the restroom, then saw him motioning for Mr. Treadwell to leave the restaurant. *See* Carmody Dep., Exhibit 23, pp. 30-38. Mr. Carmody's assumption that Mr. Lupica had fired Mr. Treadwell at this time was based upon

---

[12] Plaintiff Carmody also testified that maitre d's Lupica and Larkin fired an employee named Chris Card for "no-call, no-show"; however, personnel records clearly show that he resigned without notice. *See* Mellis Aff., Exhibit 4, p. 5, Exhibit F.

these observations and ". . . word circulated and he never came back." *Id.*, p. 34. While Mr. Lupica, understandably, sent Mr. Treadwell home for his conduct that evening, it was Mr. Zinaich, who, after consulting with his attorney, actually fired him. *See* Ziniach Aff. II, Exhibit 6, p. 2.

Finally, Plaintiff Jayme Collins offered his opinion that Allen Larkin terminated Plaintiff Todd Jones. *See* Dep. of Jayme Collins, Exhibit 27, pp. 26-27. Again, Plaintiff Collins rests his assertion upon the familiar refrain that Mr. Jones was told to go home and, "was not there any more after that." *Id.* Plaintiff Jones, however, testified in his deposition that he quit Garibaldi's by simply leaving and never going back, as reflected in his termination form. *See* Dep. of Todd Jones, Exhibit 25, pp. 35-36, Exhibit 1 thereto.

In sum, the vague and contradictory testimony of the Plaintiffs is insufficient to create a material issue of fact with regard to whether any maître d' ever actually effected the termination of any employee. Rather, the most that can be inferred from several Plaintiffs is merely their speculative assumptions that employees sent home by the maître d's and whom they never saw at work again must have been terminated by the maître d's.

The issue of whether the maitre d's had the authority to hire employees is highly reflective of the issue of their authority to terminate employees. Several Plaintiffs admitted that they knew or assumed that only the General Manager could hire new employees. *See* Hernandez Dep., Exhibit 15, pp. 25-27; Hattaway Dep., Exhibit 12, pp. 17-23; Major Dep., Exhibit 11, pp. 16-17. Others admitted that they had no knowledge of maitre d's hiring employees when asked during their depositions. *See* Ritzert Dep., Exhibit 17, p. 34-41. The majority of Plaintiffs, however, when asked if they knew of any occasion when one of the maitre d's hired an

28

employee, testified that they observed several of them *interviewing* prospective employees. When coupled with the fact that some of these interviewees were eventually hired, these Plaintiffs simply assume that it was the maitre d' who made the final hiring decision.  *See* Carmody Dep., Exhibit 23, pp. 29-30 ("I would assume that person conducting the interview would be the one hiring the employee"); Tajeda Dep., Exhibit 18, pp. 24-25 ("figured" that the MOD had the authority to hire if they were interviewing).  So, just like the situation where the maitre d's sent employees home who never returned and the Plaintiffs assumed they personally fired them, the Plaintiffs' observations of the maitre d' interviewing applicants, coupled with their later arrival at work, meant that the maitre d's must have been responsible for hiring them.

Assumptions, however, are not facts nor do they support the Plaintiffs' claims that the maitre d's regularly hired employees. They did not, as reflected in affidavits submitted by the Defendant. *See* Affidavits of Chris Zinaich, Exhibits 3 and 6; Allen Larkin; Exhibit 13; Sean Dempsey, Exhibit 8, Eric Richards, Exhibit 1, Della Mellis, Exhibit 4. Although some of the GMs would permit maitre d's to do initial interviewing, the final decision was the GM's alone. *See* Larkin Aff., Exhibit 13, p. 2; Dempsey Aff., Exhibit 8. p. 2. The hiring documents contained in the Plaintiffs' and former Plaintiffs' personnel files uniformly reflect this fact as well. *See* Defendant's Responses to Plaintiff's First Request for Production of Documents, collectively, Exhibit 28.

While maître d's were not given the authority to make the ultimate hiring decision, the evidence of record suggests that one maître d' may have briefly overstepped his authority when he first began to work at Garibaldi's in October of 2013. Michael Hewitt was previously employed as a manager at Garibaldi's sister restaurant The Olde Pink House, where his

29

responsibilities included hiring new employees. *See* Richards Aff., Exhibit 1, p. 3. Transferred to Garibaldi's in October of 2013, Mr. Hewitt began working there during a transition period between GM Angela Sheets and GM Jason Restivo as a maître d'. *Id*.   In the latter part of October, Mr. Hewitt may have hired at least three employees, Leslie Paxton, and Plaintiffs Mary Shuman and Laura Devlin, as suggested by their deposition testimony. *See* Shuman Dep., Exhibit 20, pp. 8-10; Devlin Dep., Exhibit 19, 14-15.[13] Plaintiff Chris Graham also testified that Mr. Hewitt told employees that he had hired three new female employees.  *See* Graham Dep., Exhibit 10, pp. 43-44.[14] Ms. Shuman was hired October 15, Ms. Paxton was hired October 17, and Ms. Devlin was hired October 28. *See* Exhibit 28.

After Mr. Hewitt took credit for hiring these employees in late October, Mr. Richards learned about this and personally cautioned him. *See* Richards Aff., Exhibit 1, p.  3. He explained that, although he had occupied a manager's position at The Olde Pink House that gave him the authority to hire new employees without the approval of the GM, his new position at Garibaldi's as a maître d' did not permit him to do so. *Id*.  Mr. Hewitt did not repeat this conduct.  *Id*. Thus, the brief period of time when Mr. Hewitt may have hired several new servers lasted only about two weeks in October of 2013. [15]

---

[13] Ms. Shuman also testified that Mr. Hewitt hired Lauren Polk because Ms. Polk had told her so. *See* Shuman Dep., Exhibit 20, pp. 39-40. No longer a Plaintiff in this case, however, Ms. Polk testified that she was hired by Angela Sheets before she left, a fact confirmed by her hiring documents. *See* Dep. of Lauren Polk, Exhibit 22, pp. 11-12; Mellis Aff., Exhibit 4, Exhibit G.

[14] New hire documentation suggests that GM Jason Restivo also participated, at least to some extent, in the hirings of these two Plaintiffs.  *See* Exhibit 28.

[15] It is noteworthy that Plaintiff Devlin's conclusion that Mr. Hewitt hired employees other than she was based upon her observation of him interviewing applicants who subsequently started work:

In addition to their lack of authority to hire and fire employees, the remaining *Villareal* factors also militate toward the inevitable conclusion that the maître d's cannot be considered employers for purposes of the FLSA.  The General Managers, not the maître d's, controlled the employee's working conditions, including the preparation and finalization of the servers' work schedules.  While the maître d's were permitted to gather preliminary information about the front of the house employees' general availability to work, the finalization of the schedules always rested with the General Managers.  *See* Affidavits of Zinaich I, Exhibit 3, p. 2-3; Sean Dempsey, Exhibit 8, pp. 2-3; and Allen Larkin, Exhibit 13, p. 2.  Moreover, it is undisputed that none of the maître d's ever determined the rate or method of compensation of any employee. *Id.*  Similarly, it is undisputed that the maître d's had no participation in the maintenance of employee records. *Id*.

In summary, the evidence of record clearly establishes that maître d' employees whom the Plaintiffs refer to as managers were, at most, low level supervisors who were not employers within the meaning of the FLSA.  They were thus lawfully included in the tip pool, and summary judgment should be granted to the Defendant on this issue.

---

Q.  Let's focus in on Mr. Hewitt and Mr. Dempsey.  Did you ever observe Mr. Hewitt, Michael Hewitt, hiring any person for Garibaldi's?

A.  Him interviewing people and then, shortly after, they were working.

Q.  So you observed him interviewing people, correct?

A.  Yes.

Q.  You don't know who made the final hiring decision?

A.  I do not.

*See* Devlin Dep., Exhibit 19, p. 21.

**B.  Defendant Is Entitled as a Matter of Law to a Ruling That It Complied with the FLSA's Provisions Regarding Notice to Tipped Employees**

Section 203 of the FLSA requires an employer to inform its employees of it use of the tip credit wage in order to utilize this wage. 29 U.S.C. §203(m).  An employer need only inform its employees of the tip credit wage, however, and does not have to explain it to employees in order to satisfy its minimum wage obligations. *See Ide v. Neighborhood Rest. Partners*, *LLC*, 32 F.Supp. 3d 1285, 1292-93 (N.D. Ga. 2014), *aff'd by* No. 15-11820, 2016 U.S. App. LEXIS 12143 (11th Cir. July 1, 2016).

In this case, Plaintiffs' Complaint includes an allegation that the Defendant failed to give proper notice. *See* Complaint ¶ 42. However, this failure was not included in Plaintiff's Motion for Conditional Certification, did not serve as a basis for conditional certification as a collective action, was not referenced by the Notice which followed conditional certification, and thus should not be viewed as having been conditionally certified.  Consequently, this Court should not address §203(m) notice claims as though they were being prosecuted in this collective action.  If the Plaintiffs desire to pursue the §203(m) notice claims, they should be required to do so by filing individual actions.

Regardless, as noted in this Memorandum, for many years, each of the Plaintiffs was notified of their $2.13 tip credit wage at the time of hire, and again with every pay stub. Moreover, at all times relevant, Defendant has prominently posted in its restaurant this official

notice provided by the Wage & Hour Division of the U.S. Department of Labor:



*See* Zinaich Affidavit II, Exhibit 6, p. 3; Richards Aff., Exhibit 1, p. 4. *See also* Graham

Dep., Exhibit 10, pp. 37-40, including Exhibits 2 and 3 thereto. The poster gives notice of the

applicable minimum wage, and provides the following specific information about the tip credit wage:



This notice is sufficient to comply with the FLSA notice requirements for the use of the tip credit wage. [16] *Pellon v. Bus. Representation Int'l, Inc*., 528 F. Supp. 2d 1306, 1310 (S.D. Fla. 2007), *aff'd per curiam,* No. 08-10133, 291 Fed. Appx. 310, 2008 U.S. App. LEXIS 19077 (11th Cir. Sept. 3, 2008); *Ide v. Neighborhood Rest. Partners, LLC,* 32 F. Supp. 3d 1285, 1293 (N.D. Ga. 2014), *aff'd per curiam*, No. 15-11820, 2016 U.S. App. LEXIS 12143 (11th Cir. July 1, 2016); *Howard v. Second Chance Jai Alai LLC*, Case No: 5:15-cv-200-Oc-PRL, 2016 U.S. Dist. LEXIS 170404, at *29 (M.D. Fla. Dec. 9, 2016).

*Pellon v. Bus. Representation Int'l, Inc.*, holds that a prominently displayed poster using language approved by the Department of Labor to explain 29 U.S.C. § 203(m) is sufficient notice for use of the tip credit wage. *Pellon*, 528 F. Supp. 2d at 1310-1312.  Through the entirety of the relevant period, Garibaldi has prominently displayed a poster using language approved by the Department of Labor to explain 29 U.S.C. § 203(m). *See* Zinaich Aff. II, Exhibit 6, p. 3; Graham Dep., Exhibit 10, pp.37-40 together with Exhibits 2 and 3 to Graham deposition; and Declaration

---

[16] There is no material difference between the tip credit information provided by these posters at Garibaldi's and the information provided by the current Department of Labor posters. *See* www.dol.gov/whd/regs/compliancs/posters/minwage.pdf.

with Exhibit of Nancy Duran[17] from the *Pellon* case.   The "well reasoned order" of the *Pellon*

lower court was adopted by the United States Court of Appeals for the Eleventh Circuit. *See*  291

Fed. Appx. at 311.

Subsequent to the decision in *Pellon*, the Department of Labor promulgated a regulation,

29 C.F.R. § 531.59(b)[18], which went into effect May 5, 2011, and sets out guidelines for

compliance with § 3(m) notice. Section 531.59(b) "does not require employers to do anything

other than what they were already obligated to do *under* section 203(m), which is 'inform

employees of the provisions of this subsection.'" *Nat'l Rest. Ass'n v. Solis*, 870 F. Supp. 2d 42, 56

(D.D.C. 2012) (citing 29 U.S.C. § 203(m)).   This holding of *Nat'l Rest. Ass'n v. Solis* has been

relied upon by a district court within this Circuit for continued adherence to the holding of *Pellon*

---

[17] The Duran Declaration is from the record of the *Pellon* case.  It is referenced by the *Pellon* opinion as proof of the content of the poster held to provide sufficient notice by that court. Ms. Duran's Declaration and exhibit show that the language of the poster in *Pellon* is identical to the language contained in the posters prominently displayed by Garibaldi. *See* Duran Declaration, Exhibit 29.

[18] "(b)As indicated in § 531.51, the tip credit may be taken only for hours worked by the employee in an occupation in which the employee qualifies as a "tipped employee." Pursuant to section 3(m), an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance of the employer's use of the tip credit of the provisions of section 3(m) of the Act, i.e.: The amount of the cash wage that is to be paid to the tipped employee by the employer; the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and that the tip credit shall not apply to any employee who has not been informed of these requirements in this section. The credit allowed on account of tips may be less than that permitted by statute (minimum wage required by section 6(a)(1) minus $ 2.13); it cannot be more. In order for the employer to claim the maximum tip credit, the employer must demonstrate that the employee received at least that amount in actual tips. If the employee received less than the maximum tip credit amount in tips, the employer is required to pay the balance so that the employee receives at least the minimum wage with the defined combination of wages and tips. With the exception of tips contributed to a valid tip pool as described in § 531.54, the tip credit provisions of section 3(m) also require employers to permit employees to retain all tips received by the employee." 29 C.F.R. § 531.59(b)

in a case in which the employer used a mandatory tip pool after 29 C.F.R. § 531.59(b) became effective. *Koning Restaurants, Garcia v. Koning Rests. Int'l, L.C.*, No.: 12-CV-23629-HUCK, 2013 U.S. Dist. LEXIS 186533 at *10-12 n. 3 (S.D. Fla. May 10, 2013). Indeed, the Defendant believes that no court in this Circuit has found the holding of *Pellon* to be affected by §531.59(b). In addition to *Koning, Ide v. Neighborhood Rest. Partners, LLC*, 32 F. Supp. 3d at 1292-93, adheres to the holding of *Pellon* in the context of a mandatory tip pool. Although *Ide* does not discuss § 531.59(b), the regulation is cited by counsel for the *Ide* plaintiffs in their memorandum opposing the adequacy of notice their employer provided.[19] Obviously, the *Ide* court rejected this argument.

In the recent case of *Howard v. Second Chance Jai Alai LLC*, 2016 U.S. Dist. LEXIS 170404 (M.D. Fla. Dec. 9, 2016), the court gave studied and repeated consideration to the question of §203(m) notice. Essentially, the *Howard* opinion decides that there may be two types of notice at issue: "tip credit notice" and "tip pool notice." The first is the notice required for any use of the tip credit. The latter *may* be an additional notice requirement when there is a mandatory tip pool. *Howard* holds that the prominent display of an FLSA poster provides sufficient notice for an employer to utilize the tip credit wage. *Howard*, 2016 US Dist. LEXIS 170404, at *29. The *Howard* court - after considerable discussion - reaches no conclusion as to whether any "tip pool notice" is required by § 203(m). According to *Howard*, if "tip pool notice" were to be required, it would be met where the employer advised its employees that a tip pool existed and that their participation in the tip pool was mandatory; advised the employees of the

---

[19] *See Ide v. Neighborhood Rest. Partners, LLC*, Doc. 58, filed 02/24/14, Plaintiff's Reply in Support of Her Motion for an Order to Authorize Notice to Similarly-Situated Persons pursuant to 29 U.S.C. § 216(b), Exhibit 30, pp. 19-21 (contending that text of FLSA "posters alone cannot comply with the requirement to inform employees of the provisions of § 203(m)" and citing 29 C.F.R. § 531.59(b)).

tip-pool-contribution amount, with the employees retaining the rest of their tips; and advised the employees that the pool contribution amount would be given to, and only to, the designated, customarily and regularly tipped employees. *Id.* at *42. In *Howard*, one of the ways the employer provided this notice was through "its day to day practices." *Id.*  If an employer is deemed to be required to provide "tip pool notice,"[20] Garibaldi - like the employer in *Howard* - has provided it through its day to day practices.  Like the employer in *Howard*, Garibaldi has required its employees to go through a checkout procedure at the end of every shift.  The checkout makes it clear that participation in the tip pool is mandatory. It provides specific written notice of the amount that is tipped out with the employees retaining the rest of their tips.  The checkout identifies all of the customarily and regularly tipped employees to whom the tip out is provided, and it limits the tip out to those employees.  As was the case with the employer in *Howard*, Defendant Garibaldi has provided all the notice that might even *arguably* be required attendant to its use of the tip credit wage and the maintenance of its mandatory tip pool. Defendant is therefore entitled to summary judgment as to this issue.

### C. <u>As a Matter of Law, the FLSA Does Not Permit Plaintiffs to Recover Their Tip-Outs</u>

In addition to their claim for recovery of the amount of the tip credit utilized by the Defendant ($5.12 per hour), the Plaintiffs seek to recover the amounts they tipped out while participating in the tip pool.  Of course, it is the position of the Defendant that the tip credit was lawfully utilized.  The maître d' employees properly participated in the tip pool, and the Plaintiffs

---

[20] It is the position of the Defendant Garibaldi that "tip pool notice" is not required by § 203(m) and should not be required of the Defendant Garibaldi for the same reasons asserted by the *Howard* defendant. *See Howard,* 2016 US Dist. LEXIS 170404, at *31-41. Defendant incorporates herein by reference those arguments made by the *Howard* defendant.

were given the notice required by § 3(m) of the FLSA.  However, even if this Court were to determine that the Defendant's use of the tip credit was unlawful, the Defendant would be entitled to summary judgment on the Plaintiffs' claim for recovery of the amounts they tipped out while participating in the tip pool.

Employee lawsuits brought under the FLSA may only recover the damages permitted by 29 U.S.C. § 216(b).  This section, in pertinent part, provides that:  "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee . . . affected in the amount of their unpaid minimum wages  . . . and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b). Consequently, in the context of the unlawful use of the tip credit, an employee may only recover the amount of those tips which were designated for use as the tip credit - the tips which were unlawfully designated to complete payment of the prevailing minimum wage.  In a case in which the employer pays an hourly cash wage of $2.13, and the hourly minimum wage is $7.25, the tips designated for the tip credit total $5.12 per hour. This $5.12 is all that would be required for payment of the minimum wage if the tip credit had not been utilized, and this figure multiplied by the hours of unlawful use constitutes the total of "unpaid minimum wages" that are recoverable. There is no free standing right under § 3(m) to recover tips in excess of those designated for the tip credit.

In *Trejo v. Ryman Hosp. Props. Inc.*, 795 F.3d 442 (4th Cir. 2015), the employer paid the servers more than the minimum wage.  The servers claimed that they were not provided notice of the provisions of § 3(m), and they had been required to share their tips with other employees who were not "limited to employees who customarily and regularly receive tips." *Trejo*, 795 F.3d at

446–47 Thus, the servers contended that the employer had violated § 3(m), and they were entitled to the recovery of all of the tips they had been required to share. *Id.* at 445-47.

*Trejo* holds that the requirements of § 3(m) had no application to the defendant employer because it had not utilized the tip credit. *Id.* at 448. In addition, *Trejo* denied relief to the servers because the FLSA "'simply does not contemplate a claim for wages other than minimum or overtime wages.'" *Id.*

Subsequently, in *Meller v. Wings Over Spartanburg, LLC*, No. 2:15-cv-2094-PMD, 2016 U.S. Dist. LEXIS 35792 (D.S.C. Mar. 21, 2016), the defendant, relying upon *Anderson v. Sara Lee Corp.*, 508 F.3d 181 (4th Cir. 2007), argued that a claim under the S.C. Payment of Wages Act was preempted by the FLSA where the Payment of Wages Act claim sought to recover tips in excess of those designated for the tip credit. *Meller*, relying upon *Trejo*, found no FLSA preemption because the FLSA does not provide a basis for recovery of tips other than those designated for the tip credit. *Meller*, 2016 U.S. Dist. LEXIS 35792, at *9. Tips other than those designated for the tip credit are unrelated to the payment of the minimum wage. Thus, these tips may not be recovered under § 216(b).

> In *Trejo*, the Fourth Circuit confronted the question of whether the § 203(m) Tip Credit provision of the FLSA creates a free-standing right to bring a claim for lost tip wages where an employer was not relying on the Tip Credit provision to meet its minimum wage obligation under the FLSA. [*Trejo*, 795 F.3d at 446]. In other words, the employees received the full minimum wage from their employer, in addition to earning tips from customers of the hotels and restaurants where they worked. *Id.* at 445. The Fourth Circuit found that, in such a situation, there is no free-standing right to bring a claim under the FLSA when the employer is not using the tips to meet its minimum wage obligation. *Id.* at 448. "The FLSA 'requires payment of minimum wages and overtime wages only,' and 'is unavailing where wages do not fall below the statutory minimum and hours do not rise above the overtime threshold.'" *Id.* (quoting *Nakahata v. New York-Presbyterian Healthcare Sys.*, 723 F.3d 192, 201 (2d Cir. 2013)). Thus, "the

'statutory language' [in the FLSA] . . . 'simply does not contemplate a claim for wages other than minimum or overtime wages.'" *Id.* (quoting *Nakahata*, 723 F.3d at 201-02).

That language alone is sufficient for this Court to determine that Plaintiffs' SCPWA and unjust-enrichment claims are not preempted. Plaintiffs emphasize that those claims seek only recovery of the tips they earned in excess of their minimum wages. In this case, Defendants used the Tip Credit provision to meet their FLSA minimum wage obligations. Thus, *Trejo* suggests that Plaintiffs may bring a § 216(b) collective action to enforce their rights to unpaid minimum wages. *See id.* at 446. However, as the Fourth Circuit also explained in *Trejo*, the FLSA's narrow scope is limited to enforcement of Plaintiffs' minimum wage and overtime rights. *Id.* In light of those limitations, Plaintiffs seek to recover only tips paid to expeditors in excess of minimum wage through their SCPWA and unjust enrichment causes of action. Because the FLSA does not permit a recovery beyond unpaid minimum and overtime wages, Plaintiffs assert that their only avenue for recovering such wages is through their SCPWA and unjust enrichment causes of action.

Plaintiffs state that for their SCPWA claim they "are neither invoking the minimum wage or overtime provisions of the FLSA." ... Instead, Plaintiffs focus on the language of the SCPWA and its definition of wages.... Plaintiffs claim they are entitled to receive compensation pursuant to the SCPWA for any monies they cannot recover under the FLSA. The Court concludes that Plaintiffs' SCPWA claim is not preempted because it does not duplicate the rights and relief available under the FLSA. To the contrary, Plaintiffs have deliberately shaped their SCPWA claim to not seek any wages they could recover under the FLSA.... Because Plaintiffs have explicitly stated they will not pursue such duplicative relief under the SCPWA, this Court concludes that their SCPWA claim presents no obstacle to the FLSA's purposes and objectives and is therefore not preempted. As a result, Defendants' motion to dismiss Plaintiffs' SCPWA claim is denied.

*Meller*, 2016 U.S. Dist. LEXIS 35792, at *8-11.

*Trejo*'s and *Meller's* limitations on FLSA claims seeking tips in excess of those designated for the tip credit have been recognized and applied in at least five other district court cases involving employers who utilized the tip credit wage.  *See, e.g., Foster v. M5 Hosp. Grp., LLC*, No. 4:14-cv-4517-RBH, 2015 U.S. Dist. LEXIS 111413, at *13-14 n.2 (D.S.C. Aug. 24, 2015);  *Spallone v. SOHO Univ., Inc.*, No. 4:15-cv-1622, 2015 U.S. Dist. LEXIS 115114, at *13-17 n.2 (D.S.C. Aug. 31, 2015); *Labriola v. Clinton Entm't Mgmt., LLC*, No. 15 C 4123, 2016

U.S. Dist. LEXIS 37186, at *14-15 (N.D. Ill. Mar. 22, 2016);  *Guerra v. Guadalajara, IV,* No. 3:16CV00020, 2016 U.S. Dist. LEXIS 88302, at *10 (W.D. Va. July 7, 2016);  and  *Carbone v. Zen 333 Inc*., No. 2:16-cv-0108-DCN, 2016 U.S. Dist. LEXIS 176355, at *16-17 (D.S.C. Dec. 21, 2016).

All of these cases rely on the simple fact that claims for tips other than those designated for the tip credit are not claims for "minimum or overtime wages."  Section 3(m) does not create any free-standing right to bring a claim for tips beyond those designated for the tip credit, and the FLSA only provides a private remedy for minimum or overtime wage claims due to the "narrow scope" of § 216(b).

Some courts have considered § 3(m) and the accompanying regulation as a potential basis for employees to seek the return of tips in excess of those designated for the tip credit. The best reasoned of those cases limit recovery to the amount of tips which were improperly utilized as the tip credit.  *See, e.g., Mould v. NJG Food Serv., Inc.,* NO. JKB-13-1305, 2014 U.S. Dist. LEXIS 84441 (D. Md. June 17, 2014).  The decisions turn on the question of whether the § 3(m) precondition for use of the tip credit, that  "all tips received by such employee have been retained by the employee," entitles an employee to recover *all* tips - not just those designated for the tip credit.  Such a recovery would be inconsistent with the opinion of the Ninth Circuit in *Cumbie v. Woody Woo, Inc.*, 596 F.3d 577 (9th Cir. 2010).  *Cumbie* holds that retention of "all tips" does not apply if the employee is paid the minimum wage without use of the tip credit. *Cumbie*, 596 F.3d at 581. Per *Cumbie,* the employer may require the employee's tips to be tipped-out as the employer sees fit. *Id.* at 579-83.

An employer who uses the tip credit improperly is required to pay the affected employee the amount of tips designated as the tip credit. Thus, at that point, the employer has paid the minimum wage, and is in the same position as the employer who did not utilize the tip credit. There is no basis for requiring the return of any tip-outs.

> [W]here an employer requires his employees to participate in a tip pooling arrangement, the employer may only take this "tip credit" if certain conditions are met. Specifically, under the FLSA, an employer who requires his employees to pool tips may only take a tip credit if the tip pool is limited to "customarily tipped employees." 29 U.S.C. § 203(m)(2); *Cumbie*, 596 F.3d at 580.... Therefore, where an employer implements a tip pooling arrangement that fails to meet the conditions set forth in the FLSA—as Plaintiff has alleged Defendant did here— the employer may not include tips in employees' wages for purposes of compliance with minimum wage requirements.
>
> Plaintiff would have the Court go further and find that "with the exception of a valid tip pool or tip sharing arrangement, tips are the property of the employee and must be retained by the employee".... Stated differently, Plaintiff argues that where an employer falls awry of the conditions set forth for tip pooling arrangements in section 203(m) of the FLSA, the entire tip-redistribution agreement is invalid.
>
> The Court finds that Plaintiff's contention is unsupported by the text of the statute. The FLSA's regulation of tip-pooling arrangements only pertains to "determining the wage an employer is required to pay to a tipped employee." 29 U.S.C. § 203(m). Where a tip-pooling arrangement complies with the requirements of § 203(m), the employer may claim a tip credit. However, where a tip-pooling agreement does not satisfy those requirements, employees' wages (excluding tips) must be at least minimum wage. *Id*. Indeed, as the Ninth Circuit explained in *Cumbie*, "the plain text of [section 203(m)] . . . imposes *conditions* on taking a tip credit and does not state freestanding *requirements* pertaining to all tipped employees." 596 F.2d at 581.
>
> To reiterate, the text of section 203(m) is unambiguous. Where an employer wishes to use a tip pooling arrangement and use a tip credit to meet minimum wage requirements, the tip pooling arrangement must meet certain conditions. Where the tip pooling arrangement fails to meet those conditions, the only consequence under the FLSA ... is that the employer may no longer claim a tip credit in calculating employees' wages.

*Mould*, 2014 U.S. Dist. LEXIS 84441, at *12-14.

Subsequent to the *Cumbie* decision, the Department of Labor enacted new rules by which it sought to stretch the meaning of § 203(m) so that *all* tips would become the property of employees.   A panel of the Ninth Circuit upheld the new regulation.   *Oregon Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080, 1090 (9th Cir. 2016). However, the holding of *Perez* has been flatly rejected in subsequent cases by courts outside of the Ninth Circuit - including two courts within the Eleventh Circuit. *See Aguila v. Corporate Caterers II, Inc.*, 199 F. Supp. 3d 1358 (S.D. Fla. 2016) and *Malivuk v. Ameripark, LLC*, No. 1:15-cv-2570-WSD, 2016 U.S. Dist. LEXIS 97093, at *11-12 (N.D. Ga. July 26, 2016).   The rationale for the rejection of the "flawed reasoning" which produced *Perez* is set out by this quoted passage from *Aguila*:

> Recently, in *Trejo v. Ryman Hosp. Prosps. Inc*., 795 F.3d 442, 445 (4th Cir. 2015), the Fourth Circuit addressed the question of whether an employer violated § 203(m) of the FLSA by requiring its employees to join a tip-pooling arrangement. The employees, a group of restaurant servers, did not allege that they were paid below the minimum wage, but claimed that their employer violated the FLSA by taking a portion of their tips to redistribute to bartenders, busboys and food runners. *Id.* The court, in affirming the district court's dismissal of the employees' claims, noted that § 203(m) "'does not state freestanding *requirements* pertaining to all tipped employees,' but rather creates rights and obligations for employers attempting to use tips as a credit against the minimum wage." *Id*. at 448 (quoting *Cumbie v. Woody Woo, Inc*., 596 F.3d 577, 581 (9th Cir. 2010) (emphasis in original)). Accordingly, the court held that that § 203(m) could give rise to a cause of action "only if the employer us[es] tips to satisfy its minimum wage requirements." *Id*. at 448.

> Contrary to the cogent reasoning of the Fourth Circuit, Plaintiffs maintain that § 203(m) affords them a private right of action for lost tips based on the recent Ninth Circuit decision in *Oregon Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080 (9th Cir. 2016). Some background is helpful to understand *Perez*. In 2010, the Ninth Circuit held in *Cumbie v. Woody Woo, Inc.* that § 203(m) does not apply to an employer who pays the minimum wage. 596 F.3d at 583. After *Cumbie*, in 2011, the Department of Labor ("DOL") promulgated new rules, which included a revision to 29 C.F.R. § 531.52 (the "DOL Regulation").

> The DOL Regulation provides:

> Tips are the property of the employee whether or not the employer has taken a tip credit under section [20]3(m) of the FLSA. The employer is prohibited from using an employee's tips, whether or not it has taken a tip credit, for any reason other than that which is statutorily permitted in section [20]3(m): As a credit against its minimum wage obligations to the employee, or in furtherance of a valid tip pool.

29 C.F.R. § 531.52.

In *Perez*, the Ninth Circuit addressed the question of whether the DOL Regulation is valid under *Chevron*. *See Perez*, 816 F.3d at 1086-90. The court, faced with facts nearly identical to those of *Cumbie*, read *Cumbie*'s holding as rooted in statutory silence rather than in a straightforward interpretation of § 203(m)'s plain and unambiguous language. *Id.* at 1087. Based on this reading, the *Perez* court held the DOL retained the authority to promulgate regulations interpreting § 203(m), and that the DOL Regulation was reasonable and entitled to deference. *Id.* at 1090. Plaintiffs contend that the Ninth's Circuit's reasoning is sound, and argue that the DOL Regulation supports its tip retention claims.

The Court declines to follow the Ninth Circuit's reasoning in *Perez*, as the holding of *Cumbie* is based on a plain language reading of § 203(m), not a gap in the statute. *See Perez*, 816 F.3d at 1093 ("Any rational reading of *Cumbie* unequivocally demonstrates that we determined the meaning of section 203(m) is clear and unambiguous, leaving no room for agency interpretation.") (Smith, J. dissenting); *Brueningsen v. Resort Express Inc.*, No. 2:12-CV-843-DN, 2016 U.S. Dist. LEXIS 39747, 2016 WL 1181683, at *4 (D. Utah Mar. 25, 2016) ("The majority opinion in *Perez* ignores *Cumbie*'s "repeated references to the plain and unambiguous language of section 203(m) and reads *Cumbie* as rooted in statutory silence. The words 'silent and silence' do not appear in *Cumbie*.").

Moreover, the Court agrees with *Cumbie* that "if Congress wanted to articulate a general principle that tips are the property of the employee absent a 'valid' tip pool, it could have done so without reference to the tip credit." *Cumbie*, 596 F.3d at 581. Contrary to *Perez* and the DOL regulation, § 203(m)'s silence as to employers who do not take a tip credit "is not a gap in the statute left to be filled, so much as an area of workplace conduct unaddressed by a statute concerned with a different problem entirely: assuring the payment of minimum compensation to employees." *See Trinidad*, 962 F. Supp. 2d at 562 (citations omitted). The Court disagrees with the flawed reasoning in *Perez* and finds that the DOL was without authority to address this issue.

*Aguila*, 199 F. Supp. 3d 1358, 1360–62. For the foregoing reasons, Plaintiffs are not entitled to recover their tip-outs as damages in this case.

**D.   The Defendant Is Entitled to Summary Judgment as to Plaintiffs' Claims That Defendant's Alleged FLSA Violations Were Willful**

The Defendant is entitled as a matter of law to a determination by this Court that the appropriate statute of limitations to be applied in this action is two years, not three years. Section § 255(a) of the Fair Labor Standards Act (FLSA) provides that, for any action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, the action:

> [M]ay be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

29 U.S.C. § 255(a). Therefore, the statute of limitations for claims of unpaid minimum wages is generally two years after the cause of action accrued, but if the claim is one arising out of a willful violation of the statute, a three year statute of limitations applies. *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc*., 515 F.3d 1150, 1162 (11th Cir. 2008).

As noted by this Honorable Court, in order to establish that an FLSA violation was willful, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was prohibited. *Martin v. Coastal Floor Coverings, Inc*., No. CV414-030, 2015 U.S. Dist. LEXIS 99780, at *6-7 (S.D. Ga. July 23, 2015), *report and recommendation adopted by* 2015 U.S. Dist. LEXIS 127738 (S.D. Ga. Sept. 23, 2015).  *See also McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 133 (1988). Significantly, it is the Plaintiff alone who bears the demanding burden of proving that the Defendant's acts or omissions were willful as contemplated by the FLSA. *See*

*McLaughlin*, 486 U.S. at 135; *Rodriguez v. Farm Stores Grocery*, *Inc.*, 518 F.3d 1259, 1274 (11th Cir. 2008); *Lockaby v. Top Source Oli Analysis*, 998 F. Supp. 1469, 1471 (N. D. Ga. 1998).

An employer knowingly violates the FLSA where it disregards the minimum wage laws deliberately or intentionally, such as by ignoring the advice of a responsible official that the challenged conduct is not lawful. *See Davila v. Menendez*, 717 F.3d 1179, 1185 (11th Cir. 2013) According to this Court, a finding of a willful violation is appropriate in cases where employers "ignored specific warnings that they were out of compliance, destroyed or withheld records to block investigations into their employment practices, or split employees' hours between two companies' books to conceal their overtime work." *Martin,* 2015 U.S. Dist. LEXIS 99780, at *7 (internal citation omitted).

If the employee-plaintiff cannot satisfy his burden of showing that the employer knew that it was violating the Act, the plaintiff may then seek to prove that the employer's conduct was reckless. *See Davis v. Charoen Pokphand (USA), Inc.,* 302 F. Supp. 2d 1314, 1327 (M.D. Ala. 2004). The Code of Federal Regulations defines "reckless disregard" under the FLSA as the failure to make adequate inquiry into whether conduct is in compliance with the Act. 5 C.F.R. § 551.104. This standard has been interpreted by courts in the Eleventh Circuit, as elsewhere, to require more than mere negligence on the part of the employer. *See Alvarez Perez*, 515 F.3d at 1162-63. According to the Eleventh Circuit, "If an employer acts unreasonably but not recklessly in determining its legal obligation under the FLSA, then its actions should not be considered willful and the two-year statute of limitations should be applied." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1324 (11th Cir. 2007) (citations omitted). As expanded upon by this Court:

> [I]f an employer's FLSA violations stem from mere negligence or from actions
> that are unreasonable but not reckless, the employer's liability for compensatory
> damages is limited to no more than two years. Similarly, the mere fact that the
> employer knows the FLSA is in the picture is not dispositive of willfulness, and a
> mere lack of prudence is insufficient to support a finding of willfulness.

*Henderson v. Payless Shoes*, CA No.: 204-70, 2006 U.S. Dist. LEXIS 7441, at *22 (S.D. Ga.

Feb. 14, 2006. When analyzing the issue of willfulness, courts in the Eleventh Circuit have

traditionally been unwilling to find "willful" behavior on the part of employers even where

presented with strong evidence of that an employer actually violated the FLSA. *See Saxton v.*

*Young,* 479 F. Supp. 2d 1243, 1253 (N.D. Ala. 2007) (emphasizing that employer's actions

which may be violative of Act are not necessarily willful for purposes of the statute of

limitations)*; Hamilton v. Embarq Mgmt. Co*., No. 6:08-cv-677-Orl-28DAB, 2009 U.S. Dist.

LEXIS 99239, at *10-13 (M.D. Fla. Oct. 26, 2009) (defendant produced evidence that it took

steps to comply with FLSA, thus two year limitations period applies barring claims prior to that

time).

The Eleventh Circuit has held that the determination of whether the employer's conduct

was willful within the meaning of the Act is a mixed question of law and of fact. *Allen*, 495 F. 2d

at 1324. *See also Walters v. Am. Coach Lines of Miami, Inc.*, 569 F. Supp. 2d 1270, 1302 (S.D.

Fla. 2008). However, even if a mixed question of law and fact, a plaintiff must nevertheless

present sufficient evidence of willful conduct to survive summary judgment, which is

appropriate where there exists no issue of genuine fact.  *Matsushita v. Elec. Indus. Co. v. Zenith*

*Radio Corp*., 475 U.S. 564, 586 n.11. *See also Regan v. City of Charleston*, 142 F. Supp. 3d 442,

462-63 (D.S.C. 2015) (while willfulness may ultimately be a question of fact, plaintiff must

present enough evidence to preclude summary judgment). Thus, district courts in this Circuit

routinely decide the issue of willfulness by way of summary judgment, applying the Supreme

Court's standards for such motions. *See, e.g., Saxton,* 479 F.Supp. 2d at 1254 (summary judgment granted where employer sought to enforce FLSA requirements with their policies); *Duncan v. Brockway Standard, Inc.,* No. 1:90-cv-2867-GET, 1992 U.S. Dist. LEXIS 21165, at *18 (N.D. Ga. Sept. 21, 1992) (holding that summary judgment was appropriate on issue of willfulness where plaintiff had failed to establish an issue of material fact and that two-year limitations period therefore applied); *Lockaby v. Top Source Oil Analysis*, 998 F. Supp. 1469, 1473 (N.D. Ga. 1998) (finding the record bereft of any evidence that the employer willfully violated the Act and granting summary judgment on this issue); *Hamilton*, 2009 U.S. Dist. LEXIS 99239, at *11-12 (reasoning that summary judgment was appropriate where the employer presented sufficient evidence to show that it took affirmative steps to ensure its compliance with the Act).

In this case, the Defendant is entitled to a finding by the Court that it did not act willfully in its conduct which allegedly violates the FLSA because it relied in good faith on the considered and expert advice of its counsel, as set forth in Allan Holmes's December 30, 1998 Opinion Letter to Della Mellis, the Defendant's comptroller.  *See* Mellis Aff., Exhibit 4, Exhibit A. In response to Ms. Mellis' contemporaneous inquiry, the 1998 letter advised the Defendant that the inclusion of maître d's in the tip pool at Garibaldi's was fully supported by FLSA case law. [21]

According to the Supreme Court, an employer has not willfully violated the Act where it acted reasonably in determining its legal obligations under the Act. *See McLaughlin*, 486 U.S. at 135 n.13. This reasoning was echoed by the Eleventh Circuit in *Reich v. Dep't of Conservation &*

---

[21] As indicated by Ms. Mellis' affidavit, her inquiry was spurred by a routine DOL audit of the Defendant's Charleston location of Garibaldi's. The policies and practices at the Charleston location, now closed, were identical to those at the Savannah location. *See* Mellis Aff., Exhibit 4, pp. 1-3.

*Natural Res.*, 28 F.3d 1076, 1084 (11th Cir. 1994), in which the court of appeals held that a good

faith attempt to comply, even if ineffective, does not rise to the level of "reckless disregard"

required for a willful violation of the FLSA:

> Although the Department should have done more to ameliorate the problem, it did at least attempt to address it, albeit ineffectively. We cannot say on the basis of the record before us that it showed reckless disregard for the matter of whether its conduct was prohibited. Its failure to rectify this troublesome situation can better be described as resulting from negligence rather than from willfulness.

*Reich,* 28 F.3d at 1084. It therefore affirmed the district court's ruling that employer's

infractions, if any, were not willful. Indeed, willfulness is typically only found where the

defendant was already investigated for an FLSA violation or where there is some evidence that

the defendant attempted to cover up the FLSA violation. *See, e.g., Martin v. Deiriggi*, 985 F.2d

129, 136 (4th Cir. 1992) (concluding that where employer had destroyed and withheld records

to impede investigation of its practices, a finding of willfulness by the court was proper);

*Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468, 474 (6th Cir. 1999) (defendants were

given previous warnings regarding FLSA that they did not follow).

Courts both in and outside the Eleventh Circuit have applied these principles to preclude

a finding of willfulness where the defendant employer had previously relied upon the advice of

counsel in determining its obligations under the FLSA. *See Pignataro vs. Port Authority of New

York & New Jersey,* 593 F.3d 265, 273 (3rd Cir. 2010) (employer's reliance upon advice from its

law department found not to be reckless disregard, but instead demonstrated reasonableness and

good faith effort to comply with the law*); Howard vs. Port Authority of New York & New Jersey,*

684 F. Supp. 2d 409, 415 (S.D.N.Y. 2010) (acting on advice of counsel in determining FLSA

compliance was not reckless)*; Quirk vs. Baltimore County, Md.,* 895 F. Supp. 773, 788-789 (D.

Md. 1995) (employer's consultation with legal counsel concerning the applicability of the exemption determined that two-year limitations period would apply); *Spires v. Ben Hill County*, 745 F. Supp. 690, 705-06 (M.D. Ga. 1990) (finding that the two-year limitations period applied because the defendant had consulted an attorney who was experienced in FLSA matters) *aff'd*, 980 F.2d 683 (11th Cir. 1993); *City of Charleston*, 142 F. Supp. 3d at 463 (granting defendant summary judgment on issue of willfulness where defendant had attempted to comply with its FLSA obligations, including by consulting with attorney). In fact, the Ninth Circuit has held that where an employer has relied upon substantial legal authority or upon the advice of counsel in determining its FLSA obligations, a finding of willfulness may be precluded as a matter of law. *Huss v. City of Huntington Beach,* 317 F. Supp. 2d 1151, 1161 (C.D. Cal. 2000) (citing *Service Employees Int'l Union, Local 102 v. County of San Diego*, 60 F.3d 1346, 1355-56 (9th Cir. 1994)).

In *Powell v. Carey Int'l, Inc.*, 483 F. Supp. 2d 1168 (S.D. Fla. 2007), the district court in Florida denied the plaintiffs' summary judgment on the issue of willfulness where the employer had sought and followed the advice of counsel as to their FLSA obligations. *Id*. at 1175. The *Powell* court recognized that the Defendants had sought and followed the advice of their attorney, had received representations and an opinion letter from its predecessor's attorney, and had their outside counsel provide training to the local managers. In light of these facts, the court in *Powell* reasoned that the plaintiffs had not met the "demanding burden" of showing that the defendant acted willfully in failing to pay overtime wages. *Id.  Cf. Alvarez Perez*, 515 F.3d at 1168 (jury could have reasonably concluded that violation was willful where defendant did not present advisers' testimony, the advice was not in writing and advisers did not have all relevant information to rely upon).

50

In this case, the Defendant Garibaldi's reliance upon the considered, expert and continuing advice of its long-term employment attorney precludes any conceivable finding that it acted willfully in its inclusion of the maitre d's in its tip pool. As early as 1998, almost twenty years ago, the issue of the maitre d's inclusion in the tip pool arose at Garibaldi's. *See* Mellis Aff., Exhibit 4, p. 2-3.  Ms. Mellis sought advice from Garibaldi's employment attorney, Allan Holmes. Certified as an employment specialist by the South Carolina bar, Mr. Holmes had regularly given advice about the Defendant's legal obligations to its employees, including compliance with the FLSA. *Id.*, p. 2. Mr. Holmes participated in the 1998 DOL audit of Garibaldi's, and interviewed its employees about the nature and scope of their duties. During this time period, he drafted the job description for this position that memorialized their functions and which directed their duties going forward from that date. *Id.*, Exhibit B.  Fully aware of the maitre d's' duties and the restaurant's functioning, he advised Ms. Mellis that the inclusion of them in the tip pool did not violate the FLSA.  *Id.*  He followed up his oral advice with his December 30, 1998 letter so advising her and enclosing relevant case law for Ms. Mellis' review. *Id.*, Exhibit A. Thereafter, Ms. Mellis has guided the General Managers of Garibaldi's restaurants to comply with the FLSA's requirements as Mr. Holmes had advised her. *Id.*

With these undisputed and undisputable facts, there can be no question but that the Defendant was diligent and responsible in seeking out advice to ensure that its policies complied with the FLSA.  Under no reasonable interpretation of these facts could it possibly be argued that the Defendant's knew its conduct was violative of the law such that it was willful. Rather, the Defendant believed that it to be complying with the law, a belief confirmed by no less than the DOL itself during the 1998 investigation.

Nor can Defendant's conduct be characterized as demonstrating reckless disregard. While the plaintiffs may argue that Defendant was negligent or unreasonable, such a conclusion still would not suffice to invoke the willfulness component of the Act. *See Henderson*, 2006 US Dist. LEXIS 7441, at *22 (negligent or unreasonable conduct or mere lack of prudence insufficient to establish willfulness). Finally, even if this Court should ultimately conclude that the Defendant's conduct actually violated the FLSA, such a finding similarly would not mandate a finding of willfulness. *See McLaughlin*, 486 U.S. at 135 (rejecting the plaintiffs' arguments that willfulness under the FLSA should include a good faith but incorrect assumption that the employer's policies complied with the FLSA); *City of Charleston*, 142 F. Supp. 3d at 463; *Saxton*, 479 F. Supp. 2d at 1253; *Hamilton*, 2009 US Dist. LEXIS 99239, at *10. Courts within the Eleventh Circuit have been "hesitant" to find "willful" behavior, even where presented with strong evidence in the record of a clear FLSA violation. *Saxton*, 479 F. Supp. 2d at 1253.

For these reasons, the Defendant urges the Court to grant it summary judgment on this issue and rule that the two-year statute of limitations applies to all claims asserted in this case. If the Court so rules, the plaintiffs Daniel Hernandez and Thomas Medders should be dismissed, as they were not employed by the Defendant within two years of their filing of their notices of consent to join this action. In addition, any Plaintiffs who claim relief arising out of employment more than two years prior to their filing of their notices of consent are similarly not entitled to such relief.

E. **The Defendant is Entitled to Summary Judgment as to Plaintiff's Entitlement to Liquidated Damages**

The Defendant is entitled to a determination by the Court that the Plaintiffs are not entitled to liquidated damages as a matter of law, as the Defendant acted in good faith in determining its FLSA obligations. Section 216(b) of the FLSA provides in pertinent part that:

> Any employer who violates the provisions of section 6 or 7 of this Act [29 U.S.C. §206 or §207] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b). Where the employer is found to have violated the FLSA and the jury assesses compensatory damages, the district court generally must add an award of liquidated damages in an equal amount. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1282 (11th Cir. 2008). However, such an award is not automatic, and the district court has significant discretion to deny liquidated damages if the employer shows that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the FLSA. 29 U.S.C. § 260; *Alvarez Perez*, 515 F.3d at 1163.

In accordance with the language of Section 260 and its regulations, the Eleventh Circuit has held there is both an objective and subjective component to the good faith defense that the defendant must establish in order to avoid an award of liquidated damages. *Dybach v. State of Florida Dept. of Corrections*, 942 F.2d 1562, 1566 (11th Cir. 1991). Subjective good faith has been interpreted to mean that the employer has "an honest intention to ascertain what the FLSA requires and to act in accordance with it." *Id.* (citation omitted). Objective good faith means that "the employer had reasonable grounds for believing its conduct comported with the FLSA." *Id.*

Although the question of good faith as it relates to the Section 260 liquidated damages

exception is analyzed apart from the issue of whether an employer acted "willfully" for the statute of limitations purposes, courts in the Eleventh Circuit have often conflated the two standards such that both ultimately are evaluated in terms of willfulness. *See Morales-Arcadio v. Shannon Produce Farms, Inc.,* No. 605CV062, 2007 U.S. Dist. LEXIS 51950, at *63 (S.D. Ga. July 18, 2007). *See also Davila v. Menendez*, 717 F.3d 1179, 1186 (11th Cir. 2013). In fact, a court's finding that an employer did not act willfully for the purposes of determining the limitations period can also be used to show good faith under Section 260. *Perez v. Mountaire Farms*, 650 F.3d 350, 375-76 (4th Cir. 2011). Just as with the determination of the appropriate statute of limitations period, courts may likewise deny liquidated damages at the summary judgment stage. *See Atlanta Professional Firefighters Union, Local 134 v. Atlanta,* 920 F.2d 800, 807 (11th Cir. 1991) (affirming district court's grant of summary judgment to the employer on the issue of good faith).

One way that an employer may prove that it acted in both objective and subjective good faith by showing that it obtained and relied on the advice of others in creating and maintaining the practice or policy at issue. *See Powell,* 483 F. Supp. 2d at 1176 ("Defendants have offered substantial factual support indicating that they did not pay overtime wages . . . based on a good faith belief, and advice of counsel that [the employees] were independent contractors."); *Reyes v. Falling Stores Enters.*, No. 6:04-cv-1648-Orl-KRS, 2006 U.S. Dist. LEXIS 30919, at *7-9 (M.D. Fla. May 11, 2006) (finding employer acted in good faith when it relied on advice of payroll company to establish its pay practices). Courts have consistently found an employer's actions both objectively and subjectively reasonable where the employer in good faith consulted an attorney and relied on his or her advice. *See Fuentes v. CAI Int'l, Inc.,*728 F. Supp. 2d 1347, 1358-59 (S.D. Fla. 2010) (quoting *Townley v. Floyd & Beasley Transfer Co*., No. 88-0907, 1989

54

WL 205342 *4 (N.D. Ala. Dec. 8, 1989)); *Nelson v. Ala. Inst. For Deaf & Blind*, 896 F. Supp. 1108, 1115 (N.D. Ala. 1995). In order to assert the good faith defense of §260 based on the advice of counsel, however, the employer must "honestly and truly seek the advice of counsel, counsel must give advice that is reasonable in a legal sense, and the defendant must act in strict conformity with that advice." *Fuentes,* 728 F. Supp. 2d at 1358 (citation omitted). In addition, the employer must show that not only did it seek legal advice, but that it also furnished counsel with sufficient information "necessary for a legitimate legal opinion upon which it could rely and base a subsequent defense of 'good faith.'" *Id.* at 1358-59. [22]

  In this case, the Defendant clearly acted in good faith, both objectively and subjectively, by consulting with its labor counsel, who was involved in the issue by virtue of the ongoing DOL audit of the Charleston Garibaldi's in the summer of 1998. Unquestionably, Ms. Mellis diligently and honestly sought the assistance of Mr. Holmes, who had advised them on such matters previously. An expert in employment matters, he was also well versed in the facts relating to the issue of the maitre d's compensation. He spent time interviewing Garibaldi's employees and

---

[22] Courts from other circuits have also routinely recognized the reliance on counsel defense as a means of showing good faith under §260. *See Andrews v. Cent. Cal. Irrigation Dist*., No. CV-F-97-5665 OWW SMS, 1999 U.S. Dist. LEXIS 23653, at *58 (E.D. Cal. Dec. 2, 1999) (stating that in the Fourth, Fifth, and Sixth Circuits, a defendant's reliance on the advice of counsel insulates it from an award of liquidated damages under the FLSA); *Perez*, 650 F.3d at 375-76. Good faith reliance on the advice of an attorney experienced in FLSA matters alone has been held to be sufficient to warrant the denial of liquidated damages. *See Van Dyke v. Bluefield Gas Co.,* 210 F.2d 620, 622 (4th Cir. 1954); *Garcia v. Allsup's Convenience Stores, Inc.*, 167 F. Supp. 2d 1308, 1316 (D.N.M. 2001) (stating that "an employer establishes a good faith defense to liquidated damages by diligently consulting legal specialists and labor specialists and following their advice."). *See also James v. Wash Depot Holdings, Inc.,* 463 F. Supp. 2d 1369, 1370 (S.D. Fla. 2006) (explaining that "[C]ertainly, obtaining advice of counsel would insulate a defendant from an award of liquidated damages," although the defendant had failed to do so here) (citing *Hill v. J. C. Penney Co*., 688 F. 2d 370, 375 (5th Cir. 1982)).

discussing the issue with the DOL investigator. It is significant for our purposes that the investigator ultimately agreed with Mr. Holmes that the inclusion of the maitre d's in the tip pool did not violate the FLSA.  Thereafter, Mr. Holmes memorialized his well-reasoned legal opinion in his December 30 letter to Ms. Mellis.  It was she who undertook to make certain that the parameters of the law were followed.

In sum, the Defendant sought out advice from an expert attorney, provided him with access to its employees so that he would have all necessary information, and obtained his opinion that its policy of including the maitre d's in the tip pool was in compliance with the FLSA.  The fact that the DOL also gave its blessing to this policy is icing on the cake, and surely buttresses its good faith belief that it was not violating the FLSA. If an employer cannot rely upon the imprimatur of the government agency charged with enforcing its policy, then it is difficult to imagine an employer ever acting in good faith within the meaning of the FLSA. For these reasons, the Defendant requests that the Court grant it summary judgment on the issue of liquidated damages.

## IV.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant requests that this Court grant it summary judgment as to the Plaintiffs' claims under the FLSA, or in the alternative, grant it partial summary judgment as to those issues outlined herein.

Respectfully submitted,

**GIBBS & HOLMES**

s/ Allan R. Holmes_____
Allan R. Holmes
S.C. Bar. No. 2576
Cheryl H. Ledbetter
S.C. Bar No. 100160
Post Office Box 938
171 Church Street, Suite 110
Charleston, South Carolina 29401
(843) 722-0033

**ELLIS, PAINTER, RATTERREE & ADAMS LLP**
Dana F. Braun
Georgia Bar No. 078512
2 East Bryan Street, 10th Floor
Savannah, Georgia 31401
(912) 233-9700

**COUNSEL FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

Undersigned counsel for the Defendant hereby certifies that this 17th day of March, 2017, he has filed the foregoing with the Clerk of Court's electronic filing system, which will serve notice of electronic filing (NEF) to the following counsel of record:

Jay D. Brownstein
Brownstein & Nguyen, LLC
2010 Montreal Road
Tucker, GA 30084
678-921-0143
Email: jdb@bnlawga.com

Andrew R. Frisch
Morgan and Morgan
600 N. Pine Island Road
Suite 400
Plantation, FL 33324
954-318-0268
Email: afrisch@forthepeople.com